# Supreme Court of Texas

## No. 22-0437

Texas Health and Human Services Commission,

*Petitioner,*

v.

Estate of Clyde L. Burt, Linda S. Wallace, Executor, and
Linda S. Wallace,

*Respondents*

On Petition for Review from the
Court of Appeals for the Third District of Texas

CHIEF JUSTICE HECHT, joined by Justice Boyd and Justice Devine, dissenting.

For 36 years, Clyde and Dorothy Burt lived in a home on Green River Trail. They then sold it to their daughter and son-in-law, the Wallaces, and rented another home the Wallaces owned. After seven years there, and a few weeks before their 89th birthdays and 70th wedding anniversary, the Burts moved into a skilled-nursing facility, intending to apply for Medicaid. To be eligible, their resources couldn't

exceed $3,000, excluding their home.[1]

So, the Burts repurchased a half interest in their long-time Green River Trail home for fair market value. This purchase reduced their worldly possessions from not quite $65,000 cash to just over $2,000. They completed an HHSC form that same day, stating that they considered Green River Trail to be their "home and principal place of residence", that their absence was "temporary", and that they intended to "return to live in [their] home in the future, if possible." It was not to be. Within three months, Clyde passed from this life, and Dorothy followed two months behind him.

The Burts' Medicaid application would've covered a few weeks' health costs—a little less than $24,000. But HHSC denied the Burts' Medicaid application, concluding that Green River Trail couldn't have been their home because they never lived there after buying the half interest from the Wallaces. The trial court reversed, and the court of appeals affirmed the trial court.[2] The Court reverses both lower courts based on its reading of the word "home". But its reading, unlike those of the courts below, conflicts with controlling regulations and the design of the Social Security Act. In the Court's view, the Burts' avowed intent of returning to Green River Trail to live out the last of their days wasn't wise planning and romantic aspiration, but deceptive, "artificial impoverishment" to abuse Medicaid and "saddle future generations with obligations to the few who undertake elaborate estate planning to

---

[1] 42 U.S.C. § 1382(a)(2)(B), (a)(3)(A).

[2] 644 S.W.3d 888, 890 (Tex. App.—Austin 2022).

impoverish their elderly parents,"[3] all of which is very unfairly said of the Burts.[4] I respectfully dissent.

## I

The federal statute governing Medicaid eligibility provides that in determining an applicant's resources, the "home" is excluded[5] but doesn't define the word. The Court looks to dictionary definitions as it often does when statutory terms are undefined. But Texas law provides that in determining Medicaid eligibility, HHSC "follows" 20 C.F.R. § 416.1212 "regarding the treatment of the home".[6] That regulation does define "home". Looking to dictionary definitions is thus foreclosed.

Specifically, Section 416.1212(a) defines a "home" as: "any property in which an individual (and spouse, if any) has an ownership interest and which serves as the individual's principal place of residence."[7] The Court argues that "[t]o reside and live in a place, . . . one must occupy it."[8] But Section 416.1212(c) provides that "[i]f an individual (and spouse, if any) moves out of his or her home *without the intent to return*, the home becomes a countable resource because it is no

---

[3] *Ante* at 11, 15 n.43.

[4] A word of caution: *De mortuis nihil nisi bonum*. Diogenes Laertius, *The Lives and Opinions of Eminent Philosophers* 33 (4th cent. A.D.) (quoting Chilon of Sparta, 6th cent. B.C.) (London: G. Bell & Sons, Ltd. 1915). The Burts need not have been ill-motivated to have been wrong on Medicaid law. Actually, they were neither.

[5] 47 U.S.C. § 1382b(a)(1).

[6] 1 TEX. ADMIN. CODE § 358.348.

[7] 20 C.F.R. § 416.1212(a).

[8] *Ante* at 8-9.

longer the individual's principal place of residence."[9] The reasonable implication is that if an individual moves out *with the intent to return*, the home remains his principal residence.

That reading of subsection (c) is borne out by subsection (d), which provides that if a beneficiary flees a home due to domestic abuse, the home nevertheless remains the person's principal place of residence, even without an intent to return, until a "new" principal place of residence is established. In effect, an intent to return to the home is presumed, however unlikely, until affirmatively rejected, and the home isn't a countable resource even though the domestic abuse victim has moved out.[10]

The Court argues that the Burts couldn't have intended to *return* to Green River Trail after buying an interest from the Wallaces because they didn't reside there in the "years preceding" their Medicaid claim.[11] But the Burts had occupied their Green River Trail home before applying for Medicaid—for 36 years. That they'd lived in a rental home for seven years in the interim doesn't detract from the fact that in acquiring a half interest in the home and entering nursing care, they were hoping to return to their long-time home. It was their very real and

---

[9] 20 C.F.R. § 416.1212(c) (emphasis added).

[10] *Id.* § 416.1212(d) ("If an individual moves out of his or her home without the intent to return, but is fleeing the home as a victim of domestic abuse, we will not count the home as a resource in determining the individual's eligibility to receive, or continue to receive, SSI payments. In that situation, we will consider the home to be the individual's principal place of residence until such time as the individual establishes a new principal place of residence or otherwise takes action rendering the home no longer excludable.").

[11] *Ante* at 14.

poetic goal, as they expressly affirmed. As the Court acknowledges, if the Burts had sold to the Wallaces and rented from them for even one day before repurchasing their half interest in the home, the Court wouldn't dispute that they were intending to "return" to the home they had long occupied. If anything, being removed from their long-time home for seven years only inspired the Burts to return.

According to the Court, HHSC is concerned that "an applicant [may] exclude any interest acquired after the claim for [Medicaid] assistance arises based on the applicant's declared intent to make it a future home."[12] Whatever the merits of that concern, this isn't that case.

The court of appeals argued that an applicant's subjective view of a place as home should control, pointing to the Social Security Administration Program Operations Manual System's definition of "principal place of residence" as "the dwelling the individual *considers* [his or her] established or principal home and to which, if absent, [he or she] intend[s] to return."[13] The Manual provides, as the Court notes, that the "intent to return" requirement "applies only to the continued exclusion of property which met the definition of the individual's home prior to the time the individual left the property."[14] From this the Court asserts that considering a house a home doesn't negate an occupancy requirement.[15] But the Manual states that a "right to use for life" is

---

[12] *Ante* at 7.

[13] Social Security Administration, *Program Operations Manual System* SI 01130.100.A.2 (Dec. 28, 2023) (available at https://bit.ly.496h268) (emphasis added).

[14] *Ante* at 17.

[15] *Id.*

5

evidence of ownership[16] and that when an individual owns only "one residence", HHSC should "assume that the alleged home is the individual's principal place of residence."[17]

Importantly, the Manual instructs that an applicant's "statement" regarding their intent to return is dispositive unless it is "self-contradictory",[18] a term the Manual defines clearly and narrowly.[19] The Burts' statement of intent to return to Green River Trail was clear, unambiguous, and internally consistent. Under the Manual, the Burts' intent to return to their long-term home should not be an issue. The Court's occupancy requirement thus conflicts with the Manual. The Court discounts the Manual as not having the force and effect of law without acknowledging that given its use in administering the Medicaid program, it should certainly, at the very least, be considered informative.[20]

---

[16] *Program Operations Manual System*, at SI 01130.100.C.4.

[17] *Id.* at SI 01130.100.C.5.a. As the Court notes, the Manual provides that the assumption that an alleged home is the individual's principal place of residence may be overcome only when there is "ownership in more than one residence or evidence that raises a question about the matter." *Ante* at 17 n.50. The Court risks much in reading and applying that provision. First, it ignores that the most natural reading of "evidence that raises a question about the matter", is "evidence that raises a question about *ownership*". And HHSC doesn't challenge the validity of the Burts' ownership interest, their life estate, here. Second, having assumed that its reading is correct, the Court points only to its own novel judicial creation—its prior-occupancy requirement—as "evidence that raises a question". *Id.* Finally, after having begged the question, the Court also fails to point to anything in the Manual, administrative guidance, or caselaw that supports its interpretation.

[18] *Id.* at SI 01130.100.E.1.

[19] *Id.* at SI 01130.100.E.2.

[20] And perhaps more than just informative. The U.S. Supreme Court

6

All of this should be for another day. Very literally, when the Burts applied for Medicaid, they owned a home they'd occupied before entering a nursing facility, they considered it to be their established or principal home, and they intended to return to it.

## II

The injustice the Burts suffer today is only compounded by the Court's and HHSC's position: that if only the Burts had bought the half interest in their home from the Wallaces and lived there for a day on their way to the nursing facility—if only they'd acted in reverse order—the value of their interest would've been excluded from their assets as a home in determining their Medicaid eligibility. So as long as elderly Medicaid applicants have read today's opinion, they can avoid falling into the trap that ensnared the Burts. At least some can, as the court of appeals noted:

---

has upheld Congress's explicit delegation of "broad authority" to the Secretary of the U.S. Department of Health and Human Services "to promulgate regulations defining eligibility requirements for Medicaid." *Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981). Thus, the Secretary's definition of "available" resources is entitled "to more than mere weight or deference"—it's entitled to "legislative effect". *Id.* at 44. Section 1396a, which governs state-run Medicaid plans is littered with cross-references to the SSI program, and in particular, its resource-counting methodology. *See* 42 U.S.C. § 1396a(a)(10)(C)(i), (a)(10)(G), (a)(17), (m)(1). For instance, state plans must "comply with the provisions of [§] 1396p", which regulates "transfers of assets", *id.* § 1396a(a)(18), and incorporates SSI's definition of "resources" from Section 1382b, *id.* § 1396p(c)(5) (citing *id.* § 1382b). Section 1382b itself provides that the Commissioner of the Social Security Administration "shall prescribe" the "time [and] manner in which, various kinds of property must be disposed of in order not to be included in determining an individual's eligibility for benefits." *Id.* § 1382b(b). Finally, as mentioned previously, the Texas Commission expressly claims to follow the Social Security Administration's regulatory definition of "home". 1 TEX. ADMIN. CODE § 358.348(a).

> Under [HHSC]'s argument, an applicant can exempt his home if he lives there for one day before entering a nursing facility, but an applicant living in an apartment and in the process of buying a home who, the day before closing, suffers a fall requiring nursing care cannot.[21]

But even if that catastrophe is unlikely, and the Court's decision were mostly fixable, the court of appeals' concern lingers:

> Such a distinction is not supported by the language found in the various federal statutes and rules, makes no practical sense, and in no way advances the purposes behind the assistance programs in question.[22]

The Court's textually untethered decision carries a high risk of interfering with the especially "intricate"[23] and delicate legal machinery of Medicaid, SSI, and other federal programs. For instance, 20 C.F.R. § 416.1212(d) provides that a beneficiary who flees her principal place of residence because of domestic abuse doesn't lose her benefits, as the prior residence—occupied by her abuser—remains excludable and is still "consider[ed] to be the individual's principal place of residence".[24] That residence remains excludable "until such time as [she] establishes a new principal place of residence".[25] Under the Court's view, however, a beneficiary who was a victim of domestic abuse couldn't establish a

---

[21] 644 S.W.3d at 895.

[22] *Id.*

[23] *Gray Panthers*, 453 U.S. at 43 ("The Social Security Act is among the most intricate ever drafted by Congress. Its Byzantine construction . . . makes the Act almost unintelligible to the uninitiated.") (internal quotation marks omitted).

[24] 20 C.F.R. § 416.1212(d).

[25] *Id.*

"new principal place of residence" by buying a new home because she never would've *occupied* it before applying for benefits. Thus, she couldn't intend to "return" there. The Court dismisses the inconsistency as an exception to the occupancy requirement.[26] But given that such a requirement is nowhere mentioned in the regulation, the specific treatment of a domestic-violence victim's home is better read as confirmation that no general occupancy requirement exists than as an exception to one never actually mentioned.

The Court's judicially created prior-occupancy requirement would also interfere with other federal programs. In 2014, Congress enacted the Achieving a Better Life Experience ("ABLE") Act.[27] This Act authorizes the creation of tax-advantaged savings accounts to shelter funds, subject to a funding ceiling.[28] Importantly, any qualifying disbursements from ABLE accounts are prohibited from affecting a person's eligibility for government assistance.

Before ABLE accounts became widely available, "saving money proved challenging for many people living with a disability because [government] programs often have income and resource limits."[29] But today, disabled beneficiaries can save and invest substantial sums and

---

[26] *Ante* at 14.

[27] *Spotlight on ABLE Accounts*, U.S. SOC. SEC. ADMIN. (last accessed Apr. 29, 2024), http://tinyurl.com/2mv8aa8m.

[28] *ABLE accounts can help people with disabilities pay for disability-related expenses*, INTERNAL REVENUE SERV. (July 25, 2022), http://tinyurl.com/336pwspu.

[29] *ABLE Act: What You Need to Know*, SOC. SEC. MATTERS (Dec. 17, 2020), http://tinyurl.com/3ah36rvp.

9

may also withdraw funds without penalties[30] for Qualified Disability Expenses, a category that includes "[h]ousing" expenses.[31] Several states, including Texas,[32] have implemented ABLE programs. And many disabled beneficiaries on SSI and Medicaid have since relied on the QDE exemption to buy their first homes.[33]

It stands to reason that a new home purchased with ABLE funds must itself be excludable, even though a beneficiary hasn't previously occupied it. Indeed, that very fact is a feature—not a bug—in the program. The ABLE Act was meant to provide opportunities for financial security and independence previously inaccessible to disabled beneficiaries.

The Court's prior-occupancy requirement would force disabled beneficiaries (except those fortunate few who've already got homes before applying for assistance) into a Hobson's choice: you may have housing independence, but only if you're willing to give up your federal aid. Stated differently, once you're on government assistance, "you'll

---

[30] Specifically, without tax consequences and without losing eligibility for government assistance programs like Medicaid.

[31] 26 CFR § 1.529A-2(h); SSA, *Spotlight on ABLE Accounts*.

[32] *Home*, TEXAS|ABLE (last accessed Apr. 29, 2024), https://www.texasable.org/.

[33] Molly Grace, *How people with disabilities can use an ABLE account to buy a house*, BUSINESS INSIDER (Dec. 4, 2023, 4:39 PM), http://tinyurl.com/ykr8xn8j; Robin Rothstein & Chris Jennings, *How to Buy a Home if You Have Disabilities*, FORBES (Aug. 1, 2023), http://tinyurl.com/vwuweduv; *Home*, IL|ABLE (last accessed Apr. 29, 2024), https://illinoisable.com/; *FAQ About ABLE Accounts*, CAL. DEP'T SOC. SERVS. (last accessed Apr. 29, 2024), http://tinyurl.com/yckactmc (explaining that QDEs may be used for the "[p]urchase of a primary residence"); *see also infra* note 35.

own nothing, and you'll be happy."

This entirely avoidable outcome frustrates one of the Act's central goals of "improving [the] health, independence, or quality of life [of] designated beneficiar[ies]."[34] It ignores the realities of how this system (as designed) is actually working. Disabled beneficiaries are becoming first-time homeowners without losing their benefits.[35] More importantly—in disregard of the Act's text, which states that "[h]ousing" counts as a qualified disability expense—the Court renders hollow the promise that QDEs won't affect a beneficiary's "eligibility for government assistance programs."[36]

The Court offers that its holding "does not interfere" with an ABLE account holder's "ability to purchase a new home".[37] But disabled beneficiaries with ABLE accounts and elderly applicants like the Burts can't be subject to disparate eligibility criteria under federal law, which requires eligibility standards in state-run programs to be "comparable for all groups".[38] The Court's holding leaves the concern that when an

---

[34] 26 CFR § 1.529A-2(h).

[35] *See, e.g.*, *Home*, IL|ABLE (last accessed Apr. 29, 2024), ("Having an IL ABLE Account made it possible for me to save to *buy my first home.*" (emphasis added)), ("*Now* our daughter can save for a wide range of things such as . . . purchasing an apartment" (emphasis added)).

[36] *ABLE accounts*, IRS; *see also FAQs*, TEXAS|ABLE (last accessed Apr. 29, 2024), https://www.texasable.org/faqs/ ("Any funds you withdraw that [are] used to pay for a Qualified Disability Expense . . . will [not] be considered an asset for purposes of determining your eligibility for . . . Medicaid, SSI and SSDI. Any withdrawal for housing expenses that is . . . spent in the month the withdrawal is received will also [not] be considered an asset for SSI purposes.").

[37] *Ante* at 15 n.46.

[38] 42 U.S.C. § 1396(a)(17). *See Mississippi v. Sullivan*, 951 F.2d 80,

ABLE account holder in Texas purchases a "new" house without having previously resided there, the new house won't qualify as an excludable "home" for Medicaid eligibility purposes.

## III

Finally, as the court of appeals noted, an occupancy requirement disadvantages renters by denying them, in the Court's words, "the preservation of a home after nursing care [in contravention of] Medicaid's purpose of promoting a return to independence."[39] Here is the Court's response:

> The [federal Medicaid] statute . . . returns a Medicaid applicant to the type of residence the applicant occupied before the claim for assistance arose. . . . The resources statute endeavors to calculate the funds available for care based on an applicant's living situation before the claim for assistance arises; it does not permit the applicant to change the nature of that residence (from renting to owning or from a real property interest to a home) by converting assets that otherwise are available to pay for the applicant's care.

As support, the Court points to the use of a "look-back date . . . to scrutinize eligibility" but fails to note that under the relevant statute, an applicant is only rendered ineligible for Medicaid by transferring

---

83-84 (5th Cir. 1992) ("The structure of the Act supports [the] view that subsection (a)(17) was meant to ensure comparability *between* groups"; a state "would violate subsection (a)(17) if it had one eligibility rule for the [disabled] group and another for the aged group") (emphasis in original).

[39] *Ante* at 10 (citing 42 U.S.C. § 1396-1 (stating that the purpose of Medicaid is "to furnish . . . rehabilitation and other services to help [disabled and disadvantaged families and] individuals attain or retain capability for independence or self-care")).

12

property "for *less than fair market value*".[40] A look-back date is irrelevant when, as in this case, it is undisputed that the Burts reacquired an interest in their home for fair market value. The Court cites nothing in federal law that would disqualify a Medicaid applicant who has been living in rented space, faces the need for covered medical care, and buys a home to provide for future restoration to healthy and independent life, even if, in so doing, he reduces his resources for eligibility.

To the contrary, as we have explained, federal law incentivizes Medicaid applicants to provide wisely for their future. Federal law cannot be reasonably construed to limit Medicaid applicants' efforts to care for themselves if they happened to be renters before they applied for benefits. It may be, as the Court observes, that "Congress has sought to preclude artificial impoverishment, repeatedly narrowing Medicaid eligibility to minimize abuse of the program and to conserve government resources for those most in need."[41] There is nothing to indicate, however, that Congress perversely provided that the more disadvantaged one is in applying for Medicaid, the less benefit it provides—much less that the benefits structure intentionally discriminates against renters.

*     *     *     *     *

"Home," Robert Frost wrote, "is the place where, when you have to go there, They have to take you in."[42] Green River Trail was home to

---

[40] 42 U.S.C. § 1396p(c)(1)(A) (emphasis added).

[41] *Ante* at 11.

[42] Robert Frost, *The Death of the Hired Man*.

the Burts when they applied for Medicaid. I would affirm the court of appeals. I respectfully dissent.

_____
Nathan L. Hecht
Chief Justice

**OPINION FILED:** May 3, 2024